COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

Attorneys for Plaintiff
[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREGORY L. BATTY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MOVADO GROUP, INC., EFRAIM GRINBERG, SALLIE A. DeMARSILIS, RICHARD COTÉ,<br><br>Defendants. | No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Gregory L. Batty ("Plaintiff"), residing at 330 Brocket Trail, Belvidere, Illinois 61008, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Movado Group, Inc. ("MGI" or the "Company"), as well as media reports about the Company and Company press releases and conference call transcripts involving the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired MGI publicly traded common stock between March 26, 2014 and November 13, 2014, inclusive (the "Class Period"). This action is brought against MGI and certain of its officers and/or directors for violations of the Securities and Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder. These claims are asserted against MGI and certain of its officers and/or directors who concealed material facts from the public and made materially false and misleading public statements during the Class Period.

2. MGI, one of the world's leading watchmakers, designs, sources, markets and distributes fine watches. Its portfolio of brands is currently comprised of Coach Watches, Concord, Ebel, ESQ Movado, Scuderia Ferrari Watches, HUGO BOSS Watches, Juicy Couture Watches, Lacoste Watches, Movado, and Tommy Hilfiger Watches. The Company is a leader in the design, development, marketing and distribution of watch brands sold in almost every major category comprising the watch industry.

3. Since its incorporation in 1967 (under the name North American Watch Corporation), the Company has developed its brand-building reputation and distinctive image across an expanding number of brands and geographic markets. Strategic acquisitions of watch brands and their subsequent growth, along with license agreements, have played an important role in the expansion of the Company's brand portfolio.

4. According to its Company filings, MGI is highly selective in its licensing strategy and chooses to enter into long-term agreements with only powerful brands like Lacoste and Scuderia Ferrari that are leaders in their respective businesses.

5. During the Class Period, Defendants issued materially false and misleading statements touting the purportedly attractive business prospects and strong growth expected for its flagship Movado brand as well as its portfolio of licensed brands, which includes Lacoste and Scuderia Ferrari watches. Defendants also

materially misled investors regarding their initiative to boost the Movado brand by cannibalizing the ESQ brand's shelf space at various retailers. For example, Defendants bragged to the market:

- "For fiscal 2015, we anticipate our sales will increase close to 11% to $640 million. . . . Operating income is projected to increase over 19% to $90 million." (Defendant DeMarsilis, March 26, 2014)[1]

- "Our [ESQ/Movado brand repositioning] initiative will allow us to transfer Movado product into existing ESQ retail linear space at select major retail partners. This will provide Movado product families greater merchandising opportunities as well as expansion of Movado Bold in certain existing and new doors." (Defendant Coté, March 26, 2014)

- "[L]aunching of the Scuderia Ferrari brand globally in April 2013, with core product offerings priced from $125 to $695. We have opened approximately 2300 doors in 2013, and plan on an incremental 1000 doors this year. We continue to be very pleased with the sellthrough results to date." (Defendant Coté, March 26, 2014)

- "We began the year with solid first-quarter results, highlighted by a nearly 10% increase in sales and a 9.2% increase in operating income in our smallest quarter of the year. Our Movado and licensed brands continue to lead the way with growth across geographies as we continue to grow sales with our ability to segment our product assortments and drive innovation across our brands. We remain excited about the year ahead and believe the continued momentum of our brands and growth strategies position us for a strong fiscal 2015." (Defendant Grinberg, May 22, 2014)

- "Our retail sell-through continues to outpace our shipments and the overall market. We continue to gain share in our key global

[1] MGI's fiscal year runs February 1 through January 31. Thus, MGI's fiscal year 2014 began on February 1, 2013 and ended January 31, 2014.

> markets in both our largest brand, Movado, and also our largest business, our licensed brand division. Our outlet retail stores continue to deliver positive sales and profit increases. These positive results and trends allow us to reiterate our previously issued full year guidance of delivering 10% sales growth and 19% operating profit growth." (Defendant Coté, August 26, 2014)

6. In truth, however, Defendants knew or recklessly disregarded and failed to disclose that MGI's watch brands were suffering from poor performance in fiscal 2015. As analysts following MGI stock questioned Defendants on the Company's performance and projections through the end of fiscal 2015 amidst a contracting retail market, Defendants misleadingly assured investors that MGI's strong product lines would rise above retailers' efforts to trim inventory levels. Throughout the year, Defendants continually touted expected annual sales growth of 11% and operating profit growth of nearly 20%.

7. As a result of Defendants' materially false and misleading statements and omissions, MGI common stock traded at artificially inflated prices during the Class Period.

8. Then, on November 14, 2014, MGI issued a press release preliminarily announcing disappointing third quarter financial results and suddenly slashing the Company's financial outlook for its 2015 fiscal year (ending January 31, 2015). Specifically, the Company reported that: (1) it expected third-quarter earnings in a range of 86 cents to 87 cents per share, far less than analysts' estimates of $1.13 per share; (2) it expected net sales between $188.6 million to $189.7 million for the third

quarter, well below the consensus estimate of $218.32 million; (3) certain brands, including Movado, Lacoste, and Scuderia Ferrari, had not performed as well as expected; and (4) as a result, the Company would be lowering its fiscal year 2015 guidance. In stark contrast to the sales growth of 11% and operating income growth of 19% initially promised and repeatedly reiterated throughout the Class Period, Defendants now expected sales growth of ***only 1% to 2%*** and a ***decrease*** in operating profit of 7% to 10% compared to fiscal 2014.

9. Investors reacted swiftly and severely to this news, sending the price of MGI stock down from $38.51 per share to $26.25 per share, a decline of ***nearly 32%*** on extremely heaving trading volume – its biggest one-day percentage loss in more than 14 years.

10. But, while investors suffered, Defendant Grinberg profited handsomely from MGI's artificially inflated stock price, reaping over $8.6 million in proceeds from insider stock sales during the Class Period.

**JURISDICTION AND VENUE**

11. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

12. Venue is proper in this District pursuant to §27 of the 1934. MGI's principal executive offices are located in the District at 650 From Road, Ste. 375, Paramus, New Jersey 07652-3556.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

14. Plaintiff Gregory L. Batty purchased MGI common stock as described in the attached certification, which is incorporated herein by reference, and suffered damages as a result of the securities fraud alleged herein.

15. Defendant MGI designs, sources, markets and distributes fine watches. MGI common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MOV."

16. Defendant Efraim Grinberg served at all relevant times as the Chairman and Chief Executive Officer of MGI. Grinberg sold 200,000 shares of MGI stock during the Class Period at artificially inflated prices ranging from $42.09 to $45.72 for proceeds of $8,671,500.

17. Defendant Sallie A. DeMarsilis served at all relevant times as the Chief Financial Officer and Principal Accounting Officer of MGI.

18. Defendant Richard Coté served at all relevant times as the President, Vice Chairman and Chief Operating Officer of MGI.

19. Defendants Grinberg, DeMarsilis and Coté (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of MGI's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

20. The Class Period begins on March 26, 2014. On that day, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year 2014, ended January 31, 2014. The press release reported the following net sales numbers:

**Fourth Quarter Fiscal 2014 Results on a GAAP Basis**

- Net sales in the fourth quarter were $132.3 million compared to $123.6 million in the fourth quarter of fiscal 2013 led by growth in the licensed brand category.

* * *

**Full Year Fiscal 2014 Results on a GAAP Basis**

- Net sales in fiscal 2014 were $570.3 million compared to $505.5 million in fiscal 2013 driven by growth in both the accessible luxury and licensed brand categories.

21. Moreover, the March 26, 2014 announcement provided the following fiscal 2015 guidance:

> In fiscal 2015, the Company anticipates that net sales will increase approximately 10.7% to $640 million, gross margin percent will be approximately flat to this year, operating income will increase approximately 19% to $90 million and EBITDA will be approximately $103 million. The Company anticipates net income in fiscal 2015 to increase to approximately $63.5 million or $2.44 per diluted share, reflecting a 28% anticipated effective tax rate. The Company's guidance also assumes no unusual items for fiscal 2015.

22. In addition to providing financial results, the press release described, for the first time, the Company's decision to "reallocate certain of the ESQ Movado retail space in the second quarter of fiscal 2015 to drive incremental sales of its more productive Movado brand watch families," which would bolster the Movado brand's retail visibility at the expense of the Company's ESQ brand.

23. Defendant Grinberg made the following remarks:

> The fourth quarter marked an excellent finish to a strong year of growth for Movado Group. We achieved our 16th consecutive quarter of solid

> financial performance highlighted by strong sales growth and expansion in adjusted operating margin . . . . Our consistent growth is a clear validation of our powerful innovation and developed infrastructure that enables us to drive sales increases across our Movado and licensed brands at increasing rates of profitability. In order to concentrate our resources and efforts on those brands delivering the highest return on investment, we made the strategic decision to reduce the presence of ESQ Movado in certain retail doors so that the case space can be reallocated to our more productive Movado collections. This decision, which resulted in an $8.3 million pre-tax charge in the fourth quarter, will enable us to expand the presence of our best performing Movado products at the point of sale in these doors beginning in the second quarter of fiscal 2015. We are excited about the new products we are launching this year and are focused on continuing to deliver against our strategic plan.

24. Defendant Coté added additional commentary regarding the Company's financial prospects:

> We are proud of our many achievements in fiscal 2014 including the repositioning of our Coach watch brand within the fashion watch category at an improved price-value proposition; the launch of the Scuderia Ferrari brand globally in April 2013; and the continued growth of our Movado brand. We also continued to invest in geographical infrastructure allowing us to continue driving International growth. These business milestones have positioned us well to deliver on our strategic plan initiatives of 10% annualized sales growth and 20% annualized operating profit growth. The first year of this strategic plan generated 13% sales growth and 32% adjusted operating profit growth.

25. Defendant Coté also added: "Looking at fiscal 2015, our strategies are in place to continue this momentum with the ESQ reallocation strategy announced today, as well as continued benefit from Coach and Ferrari."

26. Following the earnings release, MGI also held a conference call with analysts and investors on March 26, 2014 to discuss the Company's operations.

Defendant Coté opened the conference call boasting of many facets of MGI's business:

> We are quite pleased with the pace of our business, and our very strong fourth-quarter and full-year financial results. This is our 16th consecutive quarter of strong financial performance. Importantly, we continue to see broad-based strength across our business, with strong consumer demand and customer sellthrough.
>
> * * *
>
> The strategies we embarked upon four years ago of capitalizing on the unique aesthetic of our brands with compelling product offerings, while maximizing our world-class operating platform to deliver sustained profitable growth, have allowed us to deliver exceptional sales and profit growth, and position us to deliver the strategic plans we announced last March. Some of the important performance milestones we have achieved during the past four-year period include – first, delivering compounded annual sales growth of 14.6% over the past four years, with our largest businesses, Movado and licensed brands, each delivering compounded annual growth slightly greater than 21%.
>
> Second, growing operating profit to over $75 million, and very importantly, achieving a 13% operating profit as a percent of sales milestone. We are well-positioned to achieve our fiscal-year 2017 strategic plan target of 15% operating profit as a percent of sales.
>
> * * *
>
> Second was launching of the Scuderia Ferrari brand globally in April 2013, with core product offerings priced from $125 to $695. We have opened approximately 2300 doors in 2013, and plan on an incremental 1000 doors this year. We continue to be very pleased with the sellthrough results to date.
>
> Third, is expanding the Movado brand by delivering exceptional new product, improved merchandising of our product positions, and door expansion of Movado Bold. These have resulted in consistent market share growth, and positions us for planned continued above-market sales growth.

* * *

With the strength and momentum of the Movado brand, particularly in the United States, we believe we have a unique opportunity to greatly expand Movado's market presence and market share. This initiative will be at the expense of ESQ, yet provide a better future business growth opportunity for the Company. Our initiative will allow us to transfer Movado product into existing ESQ retail linear space at select major retail partners. This will provide Movado product families greater merchandising opportunities as well as expansion of Movado Bold in certain existing and new doors. The charge we are taking to facilitate this Movado growth initiative is similar to the charge we took in fiscal year 2013 for the Coach repositioning, which is proving to provide an excellent return on investment.

* * *

Now let me briefly discuss some global trends and provide some additional brand highlights for the quarter. From a global perspective, despite a slowing of growth this past holiday season, the Watch category continues to perform well, and we continue to experience strong sellthrough performance across our retail partners. . . .

From a brand perspective, the execution of our Movado brand strategy continues to produce particularly strong results. Globally, Movado sales grew 7% in the fourth quarter, partially impacted by shipment timing from the very high 27% growth in the third quarter. For the full year, Movado grew sales 17% as compared to fiscal 2013. Our Movado brand in the United States continues to hold the leading market share position in our key price points of $500 to $1500, and a strong market position in the $1500 to $3000 price segment. Additionally, Movado continues to outpace the market, and increase its market share in total in the $300 to $3000 price segment, and in virtually every category within this segment.

27. Defendant DeMarsilis added:

For fiscal 2015, we anticipate our sales will increase close to 11% to $640 million. As a reminder, beginning in the second quarter of 2015, certain of the ESQ retail space will be reallocated to drive incremental

> sales of the more productive Movado brand watch family. So, although ESQ will continue to be offered in select retail locations, we expect a sizable decline in our sales of ESQ in each quarter of fiscal 2015, which will be offset by an increase in Movado starting in the second quarter.
>
> * * *
>
> Operating income is projected to increase over 19% to $90 million. EBITDA is expected to increase to $103 million. Due to the mix of global pretax results, the estimated effective tax rate is expected to be 28%, and net income is planned to increase to approximately $63.5 million. We expect diluted earnings per share in fiscal 2015 will increase to approximately $2.44.

28. Defendant Grinberg concluded the opening remarks as follows:

> We are focused on investing our resources and talent and opportunities that have high returns. As Rick and Sallie touched on, and in keeping with this objective, we made the strategic decision to reallocate and reduce the presence of the ESQ watch brand in certain retail doors. This move will allow us to expand our more productive Movado brand in these doors, beginning in the second quarter of fiscal 2015. This ESQ reallocation strategy, combined with the growth initiatives already in place, position us well to continue to execute towards reaching our strategic planned objectives.
>
> Our guidance for this year translates to a compounded annual growth rate of 12% net sales and over 25% in operating income for the first two years of our multiyear strategic plan.

29. During the question-and-answer session that followed, Defendants fielded many questions regarding the Movado/ESQ reallocation and the success of the Company's licensed brands. For example, when asked for background on the reallocation, Defendants Grinberg and Coté had this to say:

> **Efraim Grinberg** – *Movado Group, Inc. – CEO and Chairman of the Board of Directors*

Well, I think what we've seen with – and I'll take that first and then see if Rick would like to add anything – that what we've seen with the really explosive growth of Bold, and the continued expansion and growth of our core assortment, and as we add more product innovation into the Movado brand, that that really gives us some more opportunities, and that the space that, today, is allocated in a lot of our national accounts, whether chain stores or department stores, could be reallocated to Movado, where it would be more productive overall for the retailer and, therefore, for the Company as well.

**Rick Cote** – *Movado Group, Inc. – President, COO and Director*

And just to add to Efraim's piece, I think it's all about the future growth opportunities. And when we're done, ESQ is going to be an ongoing position for us. But rather than trying to focus on significant growth there, we have a better opportunity of having greater growth with Movado brand. So that's behind the strategy there.

From a standpoint of the Movado price point range, we do not see a change in that. We compete in that $300 to $3000 range. Our focus is continuing to increase our share of market in the US as well as globally, but within that price range.

30. On the topic of growth from licensed brands:

**Oliver Chen** – *Citigroup – Analyst*

Okay, thanks. And on your new revenue guidance, what – could you just give us the framework for thinking of how much Coach and Ferrari are going to contribute to the growth this next year? . . .

**Rick Cote** – *Movado Group, Inc. – President, COO and Director*

* * *

[N]ow that we repositioned Coach in the second half of last year, and seen very strong growth as well as door expansion there, we would expect to see those types of trends not the same level of door expansion – we had 500 last year; we'd have much less this year – but we'd expect to have a full-year impact of that, which I think is positive. Scuderia

> Ferrari, again, the same thing – we had three quarters of a year, opened 2300 doors. We'll have an increased 1000 doors or so this year.
>
> So those two will obviously be above the average growth for the overall Company and help contribute to that close to 11% growth that we are projecting this year.

31. When an analyst inquired as to the ESQ/Movado repositioning's impact on sales, Defendant Coté expressed confidence in long-term growth:

> I guess from the first piece when we look at the sales impacts for the year, we don't give quarterly guidance, so we're not going to break out by quarterly sales impact. But certainly, ESQ growth, we made a point of not having that in the fourth quarter and really not having heavy replenishment that we otherwise could have normally had. So, if I take out the ESQ both years, our growth would've been probably closer to 11% for the fourth quarter, without – if I took the ESQ out for the two years. So, yes, we certainly had an impact on that – number one.
>
> Number two, in the first quarter, we will, each quarter, be impacted by ESQ, particularly as we have less planned growth than we were looking at and keeping it at a good stable level, but that will be impacting us for each of the first four quarters. And Movado will only really start picking up in the second quarter. So, we see a full-year impact basically a wash between the two, but certainly an impact – a negative impact in the first quarter.
>
> From a standpoint of when we look at the price per unit, certainly Movado is at a higher price point per unit. Again, we look at the sales dollars probably being equal over the full-year, but when we're done, Movado does have a little bit better margin than certainly ESQ does. And I think it's more important about the future growth prospects.
>
> When we look at our strat[egic] plan and we look at the substantial growth that we had for ESQ, and the amount of effort and resources we would need to be able to do that, we felt that we could achieve that level of growth in probably a much more leveraged and a much more sustainable profitable long-term approach by focusing on Movado. So,

> it's really about that long-term future growth of how we could get a better return on that.
>
> When you look at it from a return on investment standpoint, again, I think it's comparable to what we did with Coach, which is, taking a charge, but when we're done, we're going to be able to deliver a better return moving forward. And obviously, our strat[egic] plan has pretty substantial growth levels, both at the sales level as well as the profit level. And we believe that this strategic change will allow us to better deliver that type of performance. But when we're done, it will be a positive return on investment for us as a company.

32. Turning back to the growth of the licensed brands and Ferrari in particular, Defendant Coté offered:

> Well, Ferrari already is in the US with a lot of our key retailers. We see a greater level of expansion happening in the US. So, of the 1000 doors, I would think the US is certainly an important part. But what we've done is we've launched globally in a lot of our key partners, and we have the opportunity of expanding as we see success expanding the doors in those existing retailers that they have, as well as adding new doors. So the US does have an existence today, and yes, that will continue to grow.

33. And finally, Defendants Grinberg and Coté fielded another question regarding the scope of the ESQ/Movado reallocation:

> **Mike Richardson** – *Sidoti & Company – Analyst*
>
> The doors where you're replacing ESQ with Movado, are those doors that didn't already have Movado in it? Or is it just going to be a larger assortment? And then how many doors are we talking about?
>
> **Efraim Grinberg** – *Movado Group, Inc. – CEO and Chairman of the Board of Directors*
>
> No. They are all doors that have Movado in them. So it's really the growth of the real estate for the Movado brand. And so that makes it not only more productive for us, but also, we believe – and so do our retailers – will be much more productive for them as well. And I think

> it's an initiative that represents a very good opportunity for us down the road.
>
> So I don't – Rick, do you have a number on the number of doors?
>
> **Rick Cote** – *Movado Group, Inc. – President, COO and Director*
>
> I'll just give you an order of magnitude, and you can sit there and think of it from the standpoint of around 1000 doors.

34. MGI's fourth quarter and full-year fiscal 2014 financial results were reiterated in the Company's annual report on Form 10-K, filed with the SEC on March 28, 2014. In addition to the financials, MGI also reported:

- In order to further build on the strength and momentum of the Movado brand, in the fourth quarter of fiscal 2014 the Company recorded a pre-tax charge of $8.3 million relating to its strategy of reducing the presence of ESQ Movado while expanding the Movado brand offering in certain retail doors. In line with that strategy, the Company expects to reallocate certain ESQ Movado retail space in the second quarter of fiscal 2015 to drive incremental sales of its more productive Movado brand watch families, and will continue to offer ESQ Movado in select retail locations as well as its direct-to-consumer outlet stores and at Movado.com.

- In the fourth quarter of fiscal 2014, gross margin was impacted by a $7.5 million pre-tax charge related to anticipated ESQ Movado watch brand returns and the write down of ESQ Movado excess inventory. This charge resulted from the Company's decision to reduce the presence of ESQ Movado while expanding the Movado brand offering in certain retail doors. The Company expects to reallocate certain of the ESQ Movado retail space in the second quarter of fiscal 2015 to drive incremental sales of its more productive Movado brand watch families, and will continue to offer ESQ Movado in select retail locations as well as its direct-to-consumer outlet stores and Movado.com.

35. Additionally, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act ("SOX") by Defendants Grinberg and DeMarsilis, stating that the 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

36. On May 22, 2014, the Company issued a press release announcing its financial results for the first quarter of fiscal 2015, which ended April 30, 2014. The press release reported the following numbers for the Company and reiterated MGI's fiscal 2015 guidance:

- Net sales increased 9.9% to $120.9 million compared to $110.0 million in the first quarter of fiscal 2014 driven primarily by growth in the licensed brand category.

- The Company is reiterating guidance for fiscal 2015 which is on a comparable basis to non-GAAP fiscal 2014 results adjusted for unusual items. In fiscal 2015, the Company anticipates that net sales will increase approximately 10.7% to $640 million, gross margin percent will be approximately flat to fiscal 2014, and operating income will increase approximately 19% to $90 million. The Company anticipates net income in fiscal 2015 to increase to approximately $63.5 million, or $2.44 per diluted share, reflecting a 28% anticipated effective tax rate. The Company's guidance also assumes no unusual items for fiscal 2015.

37. The press release further quoted Defendant Grinberg regarding the Company's financial results as well as MGI's strategic decision to reduce ESQ inventory in stores:

> We began the year with solid first quarter results, highlighted by a nearly 10% increase in sales and a 9.2% increase in operating income in our smallest quarter of the year. Our Movado and licensed brands, as well as our retail outlet stores, led the way with growth across geographies as we continue to drive sales with our ability to satisfy our customers' wear occasions with a compelling array of watch styles. The ESQ reallocation strategy that we announced in March will favorably impact Movado starting in the second quarter. We remain excited about the year ahead and believe the first quarter positions us for a strong fiscal 2015. This is further evidenced by the reiteration of our annual guidance and we believe we remain on track to achieve our multi-year strategic plan.

38. Defendant Coté echoed these remarks:

> We are pleased with our strong first quarter results which reflect solid momentum in our business driven by a favorable response to our Movado and licensed brands, most notably our ongoing reintroduction of Coach watches and continued strength in Ferrari, which celebrated its one-year anniversary in April. Our growth initiatives, along with the investments we are making in Asia and Latin America, position us to continue our consistent performance well into the future. For the year, we continue to expect net sales growth of 10.7%, operating income growth of 19% and diluted earnings per share of $2.44. Looking at our balance sheet, our dividend is an integral part of our capital allocation strategy and the board's approval of a $0.10 quarterly dividend again reiterates our commitment to aligning our interests with our shareholders. Our consistent cash flow generation affords us the opportunity to continue to invest in the long-term growth of the Company as we remain focused on our business strategies, which we believe will allow us to deliver sustainable profitable growth.

39. On May 22, 2014, the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendant DeMarsilis, and reiterated the Company's previously announced quarterly financial results and financial position for the quarterly period ending April 30, 2014. In addition, the 10-Q contained signed

certifications pursuant to SOX by Defendants Grinberg and DeMarsilis, materially identical to that identified above.

40. Defendants also held a conference call with analysts on May 22, 2014 to discuss MGI's first quarter 2015 financial results. Defendant Coté opened the call as follows:

> We had a solid start to the year with our first-quarter results, positioning us well to achieve our previously issued full-year guidance. Having just returned from the Basel Watch Fair in Switzerland, we saw firsthand the tremendous enthusiasm of the global retail community to our product offerings across our entire portfolio. This reinforces that the brand strategies we are implementing are continuing to provide us with a solid platform for sustained growth. We are excited about our full-year sales plan, which is driven by strong double-digit sales growth in our Movado and licensed brands.
>
> * * *
>
> From a global perspective, the watch category continues to perform solidly, and we continue to experience above-average sell-through performance across our retail partners. Based on our plans and the great reception to our product offering at Basel World, we believe we're well-positioned to achieve our sales growth expectations of 10.7% in fiscal year 2015.
>
> * * *
>
> From a brand perspective, the execution of our Movado brand strategy continues to produce particularly strong results. The initiative we announced in the fourth quarter, to convert a substantial portion of the ESQ linear space at certain retail locations to Movado product, is in the implementation phase. We expect to see the resulting increase in Movado sales in the second and third quarters. This will provide Movado product families greater merchandising opportunities, as well as expansion of Movado Bold in certain existing and new doors. Again, we

> view this initiative as a future growth opportunity for the Company and anticipate it will provide an excellent return on investment.
>
> Our Movado brand in the United States continues to hold the leading market share position in our key price points of $500 to $1500 and a strong market position in the $1500 to $3000 price segment. Additionally, Movado continues to outpace the category and increase its market share in total in the $300 to $3,000 price segment and in virtually every category within this segment.
>
> All distribution channels continue to perform well with the above-average gains in the US Department and chain stores and our broadened specialty channel distribution.

41. Defendant DeMarsilis followed with:

> Now I would like to discuss our reiterated guidance for the current fiscal year. We continued to assume moderate global economic growth, and we're assuming no significant fluctuations in foreign currency exchange rates. For fiscal 2015, we anticipate our sales will increase close to 11% to $640 million. As a reminder, as mentioned on our year-end earnings call, certain of the ESQ retail space will be reallocated to drive incremental sales of the more productive Movado brand watchband lease. As a result, we expect to see a corresponding increase in Movado sales in the second and third quarters.
>
> * * *
>
> Also as mentioned at year end, we expect to see leverage on operating expenses for the full year, even as we continue to invest in our geographical infrastructure allowing us to continue driving growth. Operating income is projected to increase close to 19% to $90 million.

42. Defendant Grinberg then concluded by reiterating MGI's full-year fiscal 2015 guidance:

> We began the year with solid first-quarter results, highlighted by a nearly 10% increase in sales and a 9.2% increase in operating income in our smallest quarter of the year. Our Movado and licensed brands continue to lead the way with growth across geographies as we continue to grow

sales with our ability to segment our product assortments and drive innovation across our brands. We remain excited about the year ahead and believe the continued momentum of our brands and growth strategies position us for a strong fiscal 2015.

We recently returned from the Basel Watch Fair, and we're encouraged by the very enthusiastic customer response we received to our new product offerings. We're benefiting from the expansion opportunities that are afforded to us from the momentum behind our Coach watch brand and our newest brand, Scuderia Ferrari, which celebrated its one-year anniversary in April.

The ESQ reallocation strategy that we announced in March is underway with the transition of space to Movado styles in the second and third quarter. We expect this reallocated space to drive incremental sales of our more productive Movado families, including Movado Bold and our classic Museum families.

* * *

Given all this, we are iterating our annual guidance, and we believe we remain on track to achieve our multi-year strategic plan.

43. One of the first questions posed to Defendants concerned the ongoing ESQ/Movado repositioning. Defendants Grinberg and Coté assured:

**Efraim Grinberg** – *Movado Group Inc. – CEO & Chairman of the Board of Directors*

So the transition is going very well. Our retailers we're excited – the ones that we are working on this initiative with, which are our institutional accounts, are excited about the opportunities for increased productivity within their Movado assortment and being able to show more bold and more of the classic Museum assortment. And ESQ is still – we still have remaining distribution for ESQ, and we would expect that to continue.

**Rick Cote** – *Movado Group Inc. – President, COO & Director*

> So overall we're very pleased with our plans, well accepted by retailers, and obviously we are in the fiscal implementation stage of filling in new Movado product into some of that ESQ retail space.
>
> So we are pleased with it. Our plans are on target, and we're quite – we expect to deliver on our anticipated plans.

44. To a follow-up question regarding shifting product mixes between ESQ and Movado, Defendant Coté responded:

> Well, first of all, it's going to be our existing families of Movado, so we are not launching any new families to specifically fill in this. This is an expansion of the linear space that we have for our existing product. We will take the opportunity of expanding some of our Bold doors, the space in existing doors, as well as adding some new doors. So yes, theoretically it is an opportunity of shifting from an ESQ price to a Movado price.

45. Another analyst specifically asked whether the ESQ/Movado repositioning negatively impacted the Company's first quarter results. Defendant Grinberg answered:

> I think the first aspect of that is sales obviously were negatively impacted in the first quarter. Our sales would have been slightly above 11% if we just took out ESQ for both periods of time. Obviously, we did have ongoing sales of ESQ and would expect that, but obviously at a much lower level than we have had in prior years.
>
> * * *
>
> So that is really the change, and again we would expect that with Movado sales going in that our sales will be on plan and strong in the second and third quarter because of the increased level of Movado sales.

46. Defendant Grinberg allayed any concerns over MGI's international performance given "choppiness" in overseas markets:

> Yes, we have had strong performance as we have over the last number of years. So our performance has been strong, particularly in Northern Europe. We see that market being much more stable, so we are pleased with our growth there, very much driven by our licensed brands.
>
> * * *
>
> Asia we have a nice level of growth, and we have continued with strong growth in Latin and South America. So we are pleased with our global performance very much driven by the mix of our product portfolio, and obviously the licensing part of our business is the most global of our product offerings that we have.

47. On the topic of inventory levels, Defendant Grinberg offered:

> **Efraim Grinberg** – *Movado Group Inc. – CEO & Chairman of the Board of Directors*
>
> I will take the first part. I think we're very pleased with our assortments that are in the stores for each of our brands. And our inventories are in a very healthy place, but also the assortment is very fresh, and we continue to introduce innovation and newness, not only in the first quarter, but even on a more accelerated basis throughout the balance of the year, which we believe will help us achieve our revenue targets.

48. In response to additional questions from analysts with Citi Research and Dougherty & Company, Defendant Coté then took the opportunity to reiterate Defendants' confidence in MGI's recent and future sales performance, particularly with regard to previously stated fiscal 2015 financial targets:

> Again, I think we have a pretty good global portfolio. So the sales growth that I highlighted before, we would expect similar-type growth. So when we look at our overall 11% for the full year, the US may be the largest from a dollar standpoint, but obviously, we expected good growth there. Northern Europe, we're certainly – in all of Europe, we are expecting growth, but particularly Northern Europe. South and Latin America continues to outperform.

> So I think all of our geographical markets were performing well, and we would expect them to share in that strong level of growth that we have. Again, not everyone at the same level, but we are quite pleased with all the geographical markets and the level of growth prospects performance that we have had, as well as the prospects going forward.

49. Defendants Coté and Grinberg went on to downplay any concerns over "weak" retail traffic at U.S. department stores:

> **Rick Cote** – *Movado Group Inc. – President, COO & Director*
>
> First, I will take the inventory levels. We're very pleased with our inventory levels. It is one of the things – we spend a lot of time managing inventory, both our product inventory, as well as the inventory at retail. So we are very pleased with our inventory position at retail, particularly. We believe we're at the right levels. We believe we've got great product offering in there, all the new models that we want to have in there. And from our own inventory standpoint, again, we're very pleased with what we have – we do a very good job of our lifecycle management and all those types of things. So we are quite pleased with inventory positions. I will have Efraim give an update on some Basel's.
>
> **Efraim Grinberg** – *Movado Group Inc. – CEO & Chairman of the Board of Directors*
>
> * * *
>
> But our trends remain excellent, and the reception to our product from our customers was very strong.

50. Finally, regarding the reach and performance of Ferrari-branded watches, Defendant Coté added:

> Ferrari was – I'm not going to have the number right now, but it was 23 at the end of the year, and we're going to open about 1000 this year. So I would suspect the first quarter was maybe 150 to 200 doors, so we're probably in that 2500 to 2600 range going to the end of the year to around 3300.

51. On August 26, 2014, the Company issued a press release announcing its financial results for the second quarter and six month results for the period ended July 31, 2014. The press release reiterated the Company's fiscal 2015 guidance:

> The Company is reiterating guidance for fiscal 2015 which is on a comparable basis to non-GAAP fiscal 2014 results adjusted for unusual items. In fiscal 2015, the Company anticipates that net sales will increase approximately 10.7% to $640 million, gross margin percent will be approximately flat to fiscal 2014, and operating income will increase approximately 19% to $90 million.

52. Defendant Grinberg was quoted touting the Company's expected growth acceleration during the second half of the year:

> We anticipate our sales growth to accelerate during the second half of the year, as strong sell-through rates at retail are expected to drive new shipments and replenishment growth and we continue to benefit from the expansion of our Movado and licensed brands around the world.

53. Defendant Coté added:

> We are pleased with our second quarter and first half results even with a cautious global retail environment. Our retail sell-through continues to outpace our shipments and the overall market. We continue to gain share in our key global markets in both our largest brand, Movado, and also our largest business, our licensed brand division. Our outlet retail stores continue to deliver positive sales and profit increases. These positive results and trends allow us to reiterate our previously issued full year guidance of delivering 10% sales growth and 19% operating profit growth.

54. Following the issuance of the press release, on August 26, 2014, Defendants held a conference call with analysts to discuss the Company's financial

results. Analysts again questioned the Company about the ongoing ESQ/Movado reallocation as well as the Company's success with licensed brands.

55. Defendant Coté began the call by praising MGI's first-half 2015 performance and reiterating full-year guidance:

> Let me now address the results of our second quarter and first half. In the second quarter sales increased 3.8%, fueled by continued strong growth in our Movado brand, licensed brand division and retail outlet stores. The sales growth of these three businesses, which represent 93% of our sales, increased 8.3% and was negatively impacted by retailers pursuing leaner retail inventory levels.
>
> We continue to see broad-based strength across our core businesses with strong consumer demand and customer sell-through above the overall watch category performance. Operating income was $17.2 million, a slight increase from the $17 million reported in the prior period. This improved level of operating income was driven by our sales growth partially offset by an increase in operating expenses including organizational investments to support our continued growth initiatives. Earnings per share came in at $0.47 as compared to adjusted earnings per share of $0.44 in the prior period.
>
> For the first half of fiscal year 2015 our sales grew 6.5% led by 12.6% growth in our licensed brand division, 7.4% growth in our Movado brand and 9.8% growth in our outlet retail division. The sales growth of these three businesses was 10.5% despite the impact of retailers managing leaner retail inventory levels.
>
> Operating income in the first half was $28.1 million, a 3.9% increase from the $27 million reported in the first half of the prior period. . . .
>
> From a global perspective, growth in the watch category remains healthy yet, as expected, has slowed from its rapid pace of growth. We continue to experience above average sell-through performance across our retail partners.

Our multiple brand initiatives, including the Movado ESQ space conversion, Coach brand repositioning, Scuderia Ferrari door expansion and across the board new product initiatives are driving our sell-through performance which exceeded our first half sell-in performance.

These initiatives, along with retailers positioning their retail inventory levels for the holiday selling season, will allow us to continue growing our market share and, as projected, deliver second-half sales growth of approximately 13%. This sales growth will also fuel the planned second-half 27% operating profit growth, which is consistent with our actual operating profit and sales growth in the same period last year.

* * *

From a brand perspective the execution of our Movado brand strategy continues to produce particularly strong results. The initiative we announced in the fourth quarter last year to convert a substantial portion of the ESQ linear space at certain retail locations to Movado product has been virtually completed. This provides Movado product families greater merchandising opportunities as well as expansion of Movado BOLD in certain existing and new doors.

Early results with BOLD product, which was delivered early in the second quarter, are meeting and exceeding our sell-through expectations. We should start to experience increased sell-through results of Movado core product from the linear space expansion starting in the third quarter as product was just delivered at the end of the second quarter.

* * *

Our licensed brands division continues to perform extremely well. In the first half of fiscal 2015 the licensed brands global team grew sales approximately 13% with retail sell-through exceeding our sales into retail. This sales growth was driven by strong performance in Coach watches, the continued expansion of Scuderia Ferrari watches and strong growth in HUGO BOSS and Tommy Hilfiger.

* * *

We remain excited that the initiatives we have been diligently working on have succeeded in creating momentum in our business. We believe

> our combination of powerful brands, superior infrastructure and our talented global management team position us to continue along the path of above average sales and profit growth.

56. Defendant DeMarsilis again reaffirmed fiscal 2015 guidance:

> For fiscal 2015 we anticipate our sales will increase close to 11% to $640 million. . . .
>
> Operating income is projected to increase close to 19% to $90 million.

57. Next, Defendant Grinberg wrapped up the opening remarks giving even more confidence in MGI's present and future performance:

> We are pleased with our second-quarter results highlighted by increase sales, a strong gross margin and operating profit growth even as we invested in support of our future expansion. We have laid a solid base for accelerated growth during the second half of the year.

58. During the question-and-answer session, Defendant Coté offered several assurances of MGI's position in the market despite leaner inventory levels by retailers:

> I'd take a couple of things. When we look at our sell-through performance and what is happening out there, again, we're focusing on our brands as opposed to some of the other brands that may be impacting their inventory – the department stores' inventory decisions.
>
> From a standpoint if we look at it, July is a period of time where they can manage their inventory. I think the retailers have been far more cautious with managing their inventory because of the first-quarter impact on sales that have impacted them.
>
> So we are quite confident that when we look at our sell-through results, and having the appropriate level of inventory at retail, we will be able to achieve our sales targets as we have outlined in the second half of the year.
>
> So I don't view it as a destocking per se as opposed to timing of how they are managing their balance sheets and in the July timeframe they are

able to do that much more successfully than they can prior to the holiday season.

* * *

A couple things. First is I think it is much more of a global phenomenon with retailers, particularly in the major markets. So the European markets, some Latin American markets and obviously the US market. So I think that leaner inventory trend was the big department stores and chain stores being able to influence their inventory levels and have done that.

Again, when we look at our retail sell-through we are very confident and very pleased with our retail sell-through and that is very much in line with where we expect to achieve for the full year.

The second piece as to the US outperforming wholesale, again, just from a standpoint of our sales number, when I look at the sell-through results, we are very pleased that international remains strong. Yes, there are pockets of concerns such as China, Hong Kong, Turkey, Thailand, Argentina. But in general Northern Europe and even Southern Europe are stabilizing, Northern Europe continues to improve.

So our sell-through performance outpaces all of those results and when we are done we would not see that this is a US strength phenomenon versus an international weak phenomenon. We're seeing in our brands very strong sell-through across all those markets around the world.

59. Defendant Coté went on to promise strong growth in the upcoming third quarter:

We are very pleased with our inventory levels both in-house and what we have as well as at retail. We believe that our brands are extremely healthy from an inventory standpoint and obviously from a brand strength standpoint. When we look at our performance – again, we don't give quarterly guidance but we certainly would expect a strong third quarter and growth probably a tad above growth in the fourth quarter.

60. Defendant Coté also highlighted the growth of the Ferrari brand as instrumental to MGI's growth:

> Yes, and I think it's important – and I try to highlight the types of initiatives we have. So again, the Coach rebranding positioning is a very strong growth initiator for us, certainly this year, second half of last year, certainly this year and we think for the next number of years.
>
> Scuderia Ferrari, and the launch in that in the expansion of doors, again, this year we're planning about 1,000 doors and the same for the next couple of years. When we look at Movado BOLD and the excitement that we have in there from a fashion trend standpoint and the levels of activity taking place there.
>
> So again, I think not only do we have growth as part of the normal market, I also believe we're helping to lead market growth on an overall standpoint and that is why our confidence level with out-performing the market out there because of those very powerful initiatives that we have in place and that we are executing on.

61. Next, Defendant Coté touted strong "momentum" leading to an ***acceleration*** in second-half sales for the Company:

> And from a standpoint of we were really, again, don't talk on what performance is taking place in a particular 30- or 60-day time frame. However, I tried to reiterate the confidence we have in our second half sales which is really continuing the momentum of the sell-through that we have been seeing in the first half of the year.
>
> So we are confident that continuing with the sell-through results will allow us to deliver the plans that we have in there. And then on top of that, as I have outlined in my comments, we have quite a few initiatives that we are very, very excited about in each of our brands, particularly around new product launches and timing of that. So I think it is a continuation of what we've been seeing on retail sell-through.

62. Going back to inventory levels, Defendant Grinberg brushed off any worries over lean summer stock, citing the usual inventory dips before the heavier holiday selling season:

> I think – and I think Rick touched base on this. It's really that we are in the height of summer right now. July is not a time when retailers have to have even an adequate level of inventory. And so, they can use that opportunity to bring it down. And obviously the holiday season always comes once a year and retailers will begin to plan into and peak into their trending products.
>
> And we feel very comfortable that our brands are trending well at retail and retailers will need and are stocking into the holiday season. So that is really for us a timing difference throughout the year and that is why we feel comfortable with our guidance for the balance of the year.

63. When asked about the performance of licensed brands, Defendant Grinberg drew attention to a new Lacoste watch being released:

> And then on the Lacoste front, that also has been a Company somewhat in transition, but a fantastic brand and a great brand. And we are introducing some very, very strong product in the second half of the year.
>
> One of them that we announced in Basel is the L12.12 watch that actually is very closely aligned with the iconic Lacoste polo shirt. It is the SKU number of their polo shirt. And they introduced a fragrance that has been one of the best selling fragrances that is the L12.12 fragrance about two years ago. And we will introduce a watch to align with that strategy in the second half of the year that we are very excited about.

64. Lastly, Defendant Coté again bragged of strong third quarter performance growth:

> For the holiday season, really September, October and November are the big shipment periods of time, and then January is a replenishment month.

> So we would expect that if you look at the mix of growth, there would be a little stronger growth in the third quarter than the fourth.
>
> Unless, again, something happens that is unusual, which is people want to be very aggressive in their shipments in the month of November. But we would certainly know that stuff at our next call. But I am assuming a normal trending would take place.
>
> * * *
>
> I think, again, the first quarter was a very choppy quarter in many of the markets around the world. I think people see the performance of brands, and again we are very pleased with our level of performance, and retailers need to stock up for products that are performing well. So I can't sit there and say we are expecting a shift. I would expect that retailers will be quite aggressive in their purchases.
>
> And also they have got to purchase it, they've got to get it in their distribution and then get it out to their stores. So pushing it in November becomes a little bit dangerous because you want to have that product in the stores, particularly the new product and the great seller. So we are not anticipating anything unusual from an October/November timeframe versus kind of what took place in a July timeframe.
>
> So I think people have to gear up and will be doing so. And the strong performers will be getting their appropriate share of open to buy.

65. On August 26, 2014, the Company also filed a quarterly report on Form 10-Q with the SEC which was signed by Defendant DeMarsilis, and reiterated the Company's previously announced quarterly financial results and financial position for the quarterly period ending July 31, 2014. In addition, the 10-Q contained signed certifications pursuant to SOX by Defendants Grinberg and DeMarsilis, materially identical to that identified above.

66. The statements referenced above in ¶¶20-65 were each materially false and misleading when made as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a) Defendants' growth projections for sales and operating income were unrealistic and simply unattainable given declining demand in the watch market, a generally weaker retail economy, and retailers' broad efforts to trim inventory levels;

(b) the Company's ESQ/Movado repositioning, which only bolstered visibility for the Movado brand by cannibalizing shelf space previously devoted to ESQ, not only brought millions in hard costs during a weakening retail climate but also cost untold millions more in lost sales and returned ESQ inventory;

(c) far from over-performing the market generally, the Company's portfolio of licensed brands were floundering because of fashion and design misses, with the Lacoste and Scuderia Ferrari brands in particular dragging on MGI's performance because their products were not resonating with consumers;

(d) contrary to Defendants' repeated assurances about the Company's expected acceleration in sales growth, MGI was no different than its competitors worldwide in reeling from the effects of a contracting international retail market;

(e) Defendants' statements regarding the Company's sales, financial performance and expected earnings in fiscal 2015 were false and misleading and lacked a reasonable basis when made; and

(f) Defendants' SOX certifications included the misleading representation that the Company's Forms 10-K and 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that MGI's growth was unsustainable.

67. Then, on November 14, 2014, the Company issued a press release announcing disappointing preliminary third quarter sales, operating profit and earnings per share and a suddenly slashed outlook for its fiscal year ending January 31, 2015. The press release stated, in part:

> **<u>Preliminary Third Quarter Fiscal 2015 Results</u>**
>
> On a preliminary basis, for the third quarter ended October 31, 2014 the Company currently expects:
>
> - Net sales of $188.6 million compared to $189.7 million in the third quarter of fiscal 2014.
>
> * * *
>
> **<u>Fourth Quarter and Fiscal 2015 Outlook</u>**
>
> For fiscal 2015, the Company now anticipates that net sales will increase approximately 1% to 2% to a range of $585 million to $590 million, operating profit will be approximately $68 million to $70 million and earnings per diluted share will be in the range of $1.80 to $1.85, assuming a 31% effective tax rate, excluding any unusual items. For the fourth quarter, the Company anticipates net sales of $132 million to $137

> million, operating profit of $6.5 million to $8.5 million and earnings per diluted share in the range of $0.18 to $0.23. The operating profit is impacted due to continued investment in brand building and growth initiatives despite lower sales growth.

68. With respect to the Company's weak numbers, Defendant Grinberg was quoted:

> I am disappointed in our third quarter performance and our expectations for this trend to continue into the fourth quarter, which combined has caused us to reduce guidance for the full year. For fiscal 2015, our net sales are now expected to increase by approximately 1% to 2% and operating profit is expected to be down approximately 7% to 10% as compared to last fiscal year.
>
> * * *
>
> Our sell-through throughout the year for Movado has been strong domestically and our sell-through for our licensed brand portfolio has trended positively. We are outpacing the growth in the overall watch category and we continue to increase our share of market in our key global markets for our largest business. Despite this strong performance at retail, there were factors that have impacted our guidance for the year. The overall watch category is experiencing slower growth and retailers are focusing on driving improved productivity. Moreover, certain of our brands did not perform as well as planned, including Movado in international markets.

69. Rather than the projected sales growth of 11% and operating profit growth of 19% repeatedly touted during the Class Period, Defendants now expected sales growth of ***only 1% to 2%*** and a ***decline*** in operating profit by 7% to 10%.

70. Defendant Coté reiterated Defendant Grinberg's disappointment and cited problems with the Movado/ESQ reallocation and poor performance by licensed brands:

> We are disappointed to announce that we will not achieve our full year fiscal 2015 financial targets. There are several reasons for this. First, the retailer inventory build portion of our Movado / ESQ reallocation strategy did not fully materialize. Second, certain of our licensed brands substantially underperformed as compared to our expectations. Specifically, we anticipate our Lacoste brand business will be down versus last year as we continue working with Lacoste as they refine their global brand positioning. Our Scuderia Ferrari brand did not meet our expectations despite increasing sales 17% for the nine months. Third, we saw weaker than planned performance by Movado in international markets. Lastly, the overall watch category experienced weaker growth than expected in both the United States and European markets. Our profitability is also being negatively impacted by costs related to our brand building and growth initiatives which were only slightly curtailed.

71. In response to the Company's shocking announcements and slashing of fiscal 2015 financial guidance, the price of MGI common stock plummeted from $38.51 per share on November 13, 2014 to $26.25 per share on November 14, a staggering decline of ***nearly 32%*** on extremely heaving trading volume. Indeed, this was MGI's biggest one-day percentage loss in more than 14 years.

72. Analysts were understandably shocked by MGI's November 14, 2014 revelations:

(a) Dougherty & Company LLC published a report on November 14, 2014 downgrading MGI's stock and noting, "We are alarmed at the deceleration being seen in Movado's sales as the company had consistently seen near 10% growth over the past couple of years before the deceleration to 4% growth in Q2. With Q3 posting sales down almost 1% and an expectation for Q4 to also be down we sense bigger issues than just the slowdown in the watch category overall."

(b) Stephens Inc.'s November 17, 2014 report similarly downgraded MGI's stock, cautioning, "Multiple reasons were cited for the miss including a slowdown in the category, which concerns us. [MGI]'s results stand in contrast with Fossil's, which outperformed in 3Q."

(c) On November 19, 2014, Barrington Research also downgraded MGI's stock in light of the Company's "[s]ubstantial shortfall" in the third quarter. Its report expressed surprise: "We knew that management's guidance was aggressive, but based on conversations with management and early sell-in rates, we believed guidance and Q3 expectations could be achieved." The report continued, "So what went wrong in FQ3/15, especially after management was very confident that retailers would place orders for Movado products? The shortfall is a confluence of factors, which is more concerning."

## ADDITIONAL SCIENTER ALLEGATIONS

73. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information

reflecting the true facts regarding MGI, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning MGI, participated in the fraudulent scheme alleged herein.

74. Moreover, Defendant Grinberg profited from Defendants' fraud by selling 200,000 shares of MGI stock at artificially inflated share prices during the Class Period, earning himself $8,671,500 in proceeds from these transactions.

**LOSS CAUSATION/ECONOMIC LOSS**

75. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MGI common stock and operated as a fraud or deceit on Class Period purchasers of MGI common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market through partial disclosures, the price of MGI common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of MGI common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about MGI was revealed on November 14, 2014, through disclosures that removed the artificial inflation from the price of MGI common stock.

76. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of MGI's current business and business prospects. Defendants' false and misleading statements and omissions had the intended effect and caused MGI common stock to trade at artificially inflated levels throughout the Class Period.

77. As a direct result of the disclosures identified herein, the price of MGI common stock fell precipitously. The disclosures removed the artificial inflation from the price of MGI common stock, causing real economic loss to investors who had purchased MGI common stock at artificially inflated prices during the Class Period.

78. The declines were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price declines in MGI common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of MGI common stock and the subsequent significant declines in the value of MGI common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## PRESUMPTIONS OF RELIANCE

79. A Class-wide presumption of reliance is appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding MGI's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

80. Plaintiff also is entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations, because the market for MGI's publicly traded securities was open, well-developed, and efficient at all times. As a result of these materially false and misleading statements, MGI's publicly traded securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired MGI's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to MGI, and have been damaged thereby.

81. At all relevant times, the market for MGI common stock was an efficient market for the following reasons, among others:

(a) MGI common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, MGI filed periodic public reports with the SEC;

(c) MGI regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) MGI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

82. As a result of the foregoing, the market for MGI common stock promptly digested current information regarding MGI from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of MGI common stock during the Class Period suffered similar injury

through their purchase of MGI common stock at an artificially inflated price and a presumption of reliance applies.

## NO SAFE HARBOR

83. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of MGI who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

84. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired MGI common stock during the Class Period (the "Class"). Excluded from

the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

85. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. MGI trades on the NYSE and has more than 25 million shares outstanding, owned by hundreds, if not thousands, of persons.

86. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether Defendants violated the 1934 Act;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the price of MGI common stock was artificially inflated; and

(f) the extent of damages sustained by Class members and the appropriate measure of damages.

87. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

88. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

89. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**FOR VIOLATION OF SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 AGAINST ALL DEFENDANTS**

90. Plaintiff incorporates ¶¶1-89 by reference.

91. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of MGI common stock during the Class Period.

93. By virtue of the foregoing, MGI and the Individual Defendants have each violated §10b of the 1934 Act, and Rule 10b-5 promulgated thereunder.

94. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of MGI common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for MGI common stock and experienced loses when the artificial inflation was released from MGI common stock as a result of the partial revelations and stock price decline detailed herein. Plaintiff and the Class would not have purchased MGI common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

## FOR VIOLATION OF SECTION 20(a) OF THE 1934 ACT AGAINST THE INDIVIDUAL DEFENDANTS

95. Plaintiff incorporates ¶¶1-89 by reference.

96. The Individual Defendants acted as controlling persons of MGI within the meaning of §20(a) of the 1934 Act. By reason of their controlling positions with the Company, the Individual Defendants had the power and authority to cause MGI to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Plaintiff and the members of the Class damages, including interest;

C. Awarding Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 4, 2015

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP

*/s/ Peter S. Pearlman*
PETER S. PEARLMAN

Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF NON-ARBITRABILITY PURSUANT TO L. CIV. R. 201.1(d)(3)

I certify, pursuant to L.Civ.R. 201.1(d)(3), that the above-captioned matter is not arbitrable because the damages recoverable exceed the sum of $150,000 exclusive of interest and costs and any claim for punitive damages.

I certify under penalty of perjury that the foregoing is true and correct.

Executed

This 4th day of February, 2015.

*/s/ Peter S. Pearlman*
Peter S. Pearlman

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct.

Executed

This 4th day of February, 2015.

*/s/ Peter S. Pearlman*
Peter S. Pearlman

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| MOV | 8-28-2014 | 150 | $5,619.33 |
| | 10-1-2014 | 150 | $4,991.91 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| MOV | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of November 2014 in Belvidere, Illinois.
City State

(Signature) X [signature]

(Print Name) Gregory L. Batty